# HELEN V. AMOS

## *vs.*

# UNITED STATES CASUALTY COMPANY.

*Insurance*: *lapsing; payment of premium by agent; without authority.*

Where the agent of an insurance company without the request, knowledge or subsequent ratification of the insured pays to the insurance company its proportion of the premium to which the company would be entitled should the policy be renewed and makes such payment in due course and in settlement of his (the agent's) account with the company, with the understanding that should the policy not be renewed the payment so made to the company would be returned to the agent, such payment does not create an obligation to the insured on the part of the insurer or agent. p. 477

*Decided December 12th, 1917.*

Appeal from the Baltimore City Court. (STANTON, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*George Moore Brady* (with whom was *William Milnes Maloy, Harry W. Nice* and *William Joseph Tewes* on the brief) for the appellant.

*Edward M. Hammond* (with whom was *Frederick T. Dorton* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

This suit was brought to recover on an accident policy issued by the appellant, the United States Casualty Company, to James W. Amos, of Baltimore City, Maryland.

The policy is not set out in the record, but it would seem from the pleadings, evidence and admissions of counsel that it was dated December 29th, 1911, was issued for a period of one year, and was renewable from year to year by the payment of a premium of $70.00 and the execution and delivery by the company of a renewal agreement. The company thereby agreed in the event of the death of the insured while the policy was in force, resulting "directly and independently of any and all other causes from bodily injury effective solely through external, violent and accidental means" to pay to Helen V. Amos, the beneficiary named in the policy, the sum of $5,000.00, and it is stated in the brief of the appellee that there was a further stipulation that if the accident causing such injury occurred after three years from the date of the policy, and while it was in force, the company would pay to the beneficiary $7,500.00 instead of $5,000.00.

It appears from the evidence that according to the regular course of dealing and a custom of business between the company and its agents, the renewal premiums are charged to the agents of the company, and that during the month preceding the month in which the premiums are due, the company sends to its agent a renewal agreement for each policy solicited by him, signed by the proper officer of the company and to be countersigned by the agent and delivered by him to the insured when the insured pays the premium. The premiums, less the agent's commissions, are paid by the agent

before the 10th of the month following the month in which they are due, and the *agent* is given credit for the same by the company, but the company and the agent do not regard this payment by the agent as a payment by or for the insured of the premium for a renewal of the policy until the premium is paid by the insured to the agent, and if the premium is not paid by the insured, the agent is required to return the renewal agreement to the company, and the company then marks the renewal agreement "cancelled flat," and returns to the agent the part of the premium received from him. The agent is allowed to hold the renewal agreement for thirty days, and if at the expiration of that time the premium has not been paid by the insured he is expected to return it to the company, unless the company has consented to his holding it for a longer period.

The policy in question was renewed for the years beginning December 29th, 1912, and December 29th, 1913. The company received on December 29th, 1912, from A. Kirkland Weeks, of Baltimore City, its agent who solicited the policy, the renewal premium for the year commencing on that date, and received from him on December 28th, 1913, the premium for the year commencing December 29th, 1913. About the first of December, 1914, the company, in accordance with said custom, sent Mr. Weeks renewal agreements for the policies on which renewal premiums would be due that month, and received from him in accordance with said custom, on December 30th, 1914, a check for the company's share of all the premiums, amounting to about $600.00. The agreement for the renewal of this policy, which the company sent to Mr. Weeks, and which is set out in the appellee's brief, is as follows:

"E. H. C. N. P. 211038.
80 Maiden Lane.
Md. 1. Home Office, New York City.
Premium: Accident....$25.00
Health... .. 45.00
_____
(total) $70.00

AMOS *vs.* U. S. CASUALTY CO.

On the 3rd of June, 1915, the insured fell while crossing McCulloh street, in Baltimore City, and sustained injuries from which he died the following day. The company refused to pay the claim of the beneficiary, and this suit was brought by her to recover the amount of the policy.

A number of exceptions were reserved during the trial, but the important question is raised by the exception to the granting of the prayer of the defendant withdrawing the case from the jury.

The plaintiff's witness, James W. Meadow, assistant secretary of the company, testified in substance to the course of dealing we have already stated between the company and its agent, Mr. Weeks; that the company received from Mr. Weeks "in usual course," on the 30th of December, 1914, the premium for the renewal of the policy in question for the year commencing December 29th, 1914; that the policies are renewed by renewal agreements which are not "valid" until countersigned by the agent to whom they are sent; that the agreement for the renewal of the policy issued to Mr. Amos was returned by Mr. Weeks to the company in April, 1915, and the policy was cancelled by the company as of December 29th, 1914, because the premium had not been paid, and that the part of the premium which the company had received from Mr. Weeks was returned to him by the company. If the evidence had stopped there, it is clear that the plaintiff would not have been entitled to recover. The fact that the company received on December 30th, 1914, from Mr. Weeks its share of the premium for the renewal of the policy, when considered in connection with the course of dealing between the company and its agent, as disclosed by this evidence, and the terms upon which the policy was renewable, cannot be treated as evidence that the premium for a renewal of the policy was paid by or for the insured. It was not considered by the company or by Mr. Weeks as a payment of the premium, and the proof referred to contains no evidence that the insured knew that the company had received a part of the premium from Mr. Weeks or that he understood that

what Mr. Weeks did constituted payment of the premium. It is said in 25 *Cyc.* 725: "If the premium is actually paid by the agent of the company for the insured, on an agreement between them, and such payment is accepted by the company, this will be sufficient to bind the company," and in the case of *Home Insurance Company* v. *Curtis,* 32 Mich. 402, where the Court said: "If the company actually received the premium, it is a matter of no consequence who paid it," the Court stated in its opinion: "There was evidence introduced tending to show that at the time the insurance was effected, it was understood that credit was to be given for the premium; that the agents of the company afterwards paid the premium to the company and received from Linton an endorsed note for the amount in payment thereof, which they had discounted, and that this note was afterwards taken up and a new note given for the amount of the first, with interest added, and that this note matured and was paid some days after the loss under the policy occurred." It will be observed that the authorities cited, which are relied on by the appellant, deal with the payment of the premium by the agent in pursuance of an understanding with the insured, and where the amount of the premium is accepted by the company from the agent as payment of the premium. In the case at bar, the proof referred to furnishes no evidence that Mr. Weeks sent to the company the share of the premium due it in pursuance of any understanding or agreement with the insured, or that the company accepted it in payment of the premium. On the contrary, it tends to show, as we have stated, that neither the company nor Mr. Weeks regarded it as payment of the premium, and that the money was sent to the company by Mr. Weeks and accepted by it with the understanding that if the premium was not paid by the insured, it would be returned by the company to Mr. Weeks. In the case of *Crook* v. *N. Y. Life Ins. Co.,* 112 Md. 268, JUDGE BURKE, speaking for this Court, said on page 278: "The fact that the agent held a receipt of the appellee, transmitted to him from the home office, regularly executed, and

only requiring to be countersigned by him to enable him to receive the money due on the policy, has been much relied on as evidence of the authority in the agent to receive the overdue premium and waive the forfeiture. But that fact must be taken in connection with the regular course of dealing between the home office and the agent, as shown by the appellant's evidence, and also, in connection with what is expressly provided for on the face of the policy. It is not to be presumed that the receipt was transmitted to the agent to be used by him in any other manner than is required and authorized by the policy." In the case of *Brown* v. *Insurance Company,* 59 N. H. 298, the Court said: "Nor is the defect in the plaintiff's case supplied by the defendant's testimony. The fact that the company charged the premium to Hodgdon when they issued the policy, being in accordance with the custom of the business between the company and their agents, not being regarded by the company as a payment, and not being known to and understood by the plaintiff as a payment of his indebtedness to the company, cannot now be held to have had that effect. As against the agent, it was not a debt due to the company until he received the money; if he never received the money and returned the policy, the premium was credited to him on the company's books; and if he delivered the policy without receiving the premium, the policy by its terms was not to be enforced. And there is no evidence that Hodgdon agreed with the plaintiff to become personally responsible to the company for the amount of his premium." In the case of *Van Wert* v. *St. Paul Fire & Marine Ins. Co.,* 90 Hun. 465, the Supreme Court of New York said: "In making up the accounts between the defendant and the agent of the company, who issued the policy in question, the amount of this policy was charged to such agent, and, upon its being cancelled, the unearned portion thereof was credited to such agent. It does not appear that this was done either at the request or with the knowledge of the plaintiff, for after the fire occurred, and before the commencement of this action, she tendered the full amount of the

premium to the defendant. The claim is made that this payment, if it can be called such, by the agent to the company, inured to the benefit of the plaintiff, and was in law a payment by her, so far as the insurance company was concerned, of the premium. Without citing any authorities upon that question, it seems to me that, even if it should be considered payment by the agent instead of a mere regulation of the accounts between the company and the agent, it is not one that inures to the benefit of the plaintiff. She did not request it; it does not even appear that she knew that it had been done; so far as the evidence shows the only communication that was made to her was in asking her to pay the premium, and to inform her that the policy would be canceled if it was not. As a matter of fact she did not pay a dollar, and did not offer to pay the premium until after her property had been destroyed by fire. There was neither prior authority nor subsequent ratification. The agent was not her agent but the agent of the company. She never ratified the account before the fire, because she did not know that it had been done. She did not ratify it after the fire, and before the commencement of this action, but, on the contrary, tendered the amount of the premium, assuming it to be unpaid. It seems to me that the transaction was a mere matter of accounts between the defendant and its agent, of which the plaintiff cannot take advantage."

The appellant, however, relies upon the testimony of Mr. Nice as sufficient evidence of payment of the premium to require the trial Court to submit the question to the jury. The testimony of Mr. Nice, as set out in the record, is as follows: "The witness took charge of Mr. Amos' affairs after the accident and he saw Mr. Weeks. The witness did not know Mr. Weeks at that time but understood his name to be Kirk. Mr. Singer called him Kirk. The witness had a conversation with Mr. Weeks on June 4th, the day after Mr. Amos was hurt. The witness went to Mr. Singer's office, the time was 4 o'clock in the afternoon of June 4. I had some information which caused me to call him up and advise

him that I was coming up and asked him if he would get his agent who wrote the policy for Mr. Amos. Mr. Weeks was there and Mr. Singer introduced him to me as Kirk and I was under the impression that his name was Kirk. I was there for the purpose of finding out whether the policy of Mr. Amos was in force and I asked Mr. Weeks if the premium on that policy which the company had written for Mr. Amos had been paid, and he told me that the premium had been paid. I said, the policy is in force then? He said, No, I have cancelled it. I said, Did you cancel it at the request of Mr. Amos? He said, No; and I said, Did you have any authority to cancel that policy for Mr. Amos? and he said, No; and I said, Did Mr. Amos know that you had cancelled this policy? and he said, I don't know; and I said, Why did you cancel the policy? and he said, I wanted my money, I got tired of waiting. And I said, Did you ask Mr. Amos for his money? and he said, Oh, yes; and I said, What did he say? He said he was going to pay me, and he told me that he had some money coming to him from Mr. Singer; and I said, Did you see Mr. Singer? and he said, Yes; and I said, Then why did you cancel the policy without instructions from Mr. Amos? and he said, Why, I just did it; and I said, That is the most high-handed proceeding that I ever heard of. He told me that he had paid the premium at the request of Mr. Amos, and I said, That is a civil matter between you and Mr. Amos and you had no right in the world to cancel that policy without Mr. Amos' consent, and I said, I am going to take charge and take this matter into every court in the land. I probably used some profanity. He said, You can't take charge unless the man is dead; Is he dead? I said, No, but he will not live very long."

It must be conceded that no part of the premium for the renewal of the policy for the year beginning December 29th, 1914, was paid by Mr. Amos. The statements of Mr. Weeks as testified to by Mr. Nice are to that effect, for he says that Mr. Weeks told him that he, Mr. Weeks, paid the premium, and that he had the policy cancelled because he was tired

waiting for his money. The only part of this testimony that gives any color to the contention of the plaintiff, is the statement that Mr. Weeks said that he paid the premium at the request of Mr. Amos. Mr. Weeks denied that he made any such statement to Mr. Nice, but in passing upon the prayer withdrawing the case from the jury we must assume the truth of Mr. Nice's testimony. Assuming then that Mr. Weeks told Mr. Nice that he had paid the premium at the request of Mr. Amos, the question is, is that statement by Mr. Weeks, when considered in connection with the testimony of the plaintiff's witness, James W. Meadow, as to the course of dealing between the company and its agent, sufficient to justify a finding that the renewal premium was actually paid to the company for Mr. Amos? Now the testimony of Mr. Meadow shows that what was actually done was that Mr. Weeks, in accordance with the regular course of dealing between the company and its agent, sent the company its share of the premium for the renewal of the policy, and that the company received it on the 30th of December, 1914; that neither the company nor Mr. Weeks regarded that payment by Mr. Weeks as a payment by or for Mr. Amos of the renewal premium; that Mr. Weeks never countersigned or delivered the renewal agreement to Mr. Amos, and that accordingly when Mr. Weeks returned the agreement to the company because of Mr. Amos' failure to pay the premium, the company cancelled the policy and returned to Mr. Weeks the part of the premium it had received from him. Under such circumstances, the statement by Mr. Weeks to Mr. Nice that he paid the premium at the request of the insured cannot be regarded as evidence to show that the premium was in fact paid by Mr. Weeks for Mr. Amos. The company did not accept the money received from Mr. Weeks as a payment of the premium, and Mr. Weeks did not so intend it, and there is not a suggestion in the testimony of Mr. Nice that Mr. Amos understood that the premium had been paid for him. The payment made by Mr. Weeks to the company did not, therefore, create any obligation on the part of the com-

pany to Mr. Amos, or any obligation on the part of Mr. Amos to Mr. Weeks.

We are not required in this case to determine whether an agent of an insurance company can, without the knowledge or the consent of the company, pay the premium due by a policy-holder so as to bind the company. The only question with which we are here concerned is whether the record contains any legally sufficient evidence of payment of the premium, and we concur in the conclusion of the Court below that it does not. We will therefore affirm the judgment, without, however, approving the form of the prayer granted at the conclusion of the testimony in the case, which refers only to the evidence offered by the plaintiff.

*Judgment affirmed, with costs.*